## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**LEWIS D. SIEGAL AND**
**JOANNA SIEGAL**,                                     Chapter 7
          Debtors                                     Case No. 14-13678-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the "Motion of Creditor, Martin Siegal, Individually

and as Trustee of Marty's Realty Trust, to Vacate Orders of Discharge [Doc. #53 - #541 [sic]]

for the Narrow Purpose of Approving Settlement Agreement," pursuant to which  Martin

Siegal, Individually and as Trustee of Marty's Realty Trust, (collectively, "Mr. Siegal"),

seeks 1) to reopen the Debtors' Chapter 7 case which was closed on April 24, 2015; and 2)

to vacate the discharge order which was entered on April 21, 2015.  Martin Siegal is the

father of Lewis D. Siegal.[1]  The Debtors filed an Opposition to the Motion.  The Court heard

the matter on June 3, 2015 and directed counsel to submit time lines as to their settlement

negotiations, which they did.  Neither party requested an evidentiary hearing.  The

material facts necessary to resolve the Motion to Reopen, except for one,  are not in dispute.

---

[1] Mr. Siegal withdrew his requests for relief at the June 3, 2015 hearing as to the Debtor, Joanna Siegal.

## II. FACTS

Lewis D. Siegal and Joanna Siegal (collectively, the "Debtors" and, individually, the "Debtor") filed a Chapter 7 petition on July 31, 2014.  On Schedule F-Creditors Holding Unsecured Nonpriority Claims, they listed Mr. Siegal as the holder of an unsecured debt in the sum of $630,669.95.  Following the commencement of the case, the court issued and mailed to all creditors, including Mr. Siegal, the "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines" on August 4, 2014.  The Notice advised creditors of the date and time of the meeting of creditors, i.e., September 9, 2014, as well as the deadline to object to the Debtors' discharge or to challenge dischargeability of certain debts, i.e., November 10, 2014.  On September 10, 2014, the Chapter 7 Trustee filed a Report of No Distribution.

On November 10, 2014, Martin Siegal, in his individual capacity only, filed an "Assented-to Motion for a 14 Day Extension of Time to File Objections to Discharge of the Debtor," pursuant to which he sought an extension of time "to file a complaint objecting to the discharge of debtor Lewis D. Siegal. . . " on grounds that the parties were "attempting to resolve the issue regarding the dischargeability or non-dischargeability of Martin's debt." The Court granted the Motion.  On November 21, 2014, Mr. Siegal filed an Assented-to Motion requesting an extension until December 12, 2014;[2] the Court granted

---

[2] Pursuant to Federal Rules of Bankruptcy Procedure 4004(b), 4007(c) and 9006(b), the time within which Martin Siegal, as Trustee of Marty's Realty Trust (or as an officer of any other entity in which he has an interest), could file a complaint under 11 U.S.C. §§ 523, 727 expired on November 10, 2014, as only Martin Siegal, individually, timely requested an extension on November 10, 2014.

that motion as the Debtor did not raise the issue of the capacity of Martin Siegal, as Trustee of Marty's Realty Trust, to seek an extension.   Thereafter, on December 12, 2014, January 2, 2015, January 21, 2015, February 13, 2015, and March 6, 2015, Mr. Siegal sought and obtained additional extensions of time to file a complaint.   On March 27, 2015, Mr. Siegal sought a further extension of time until April 17, 2015 to file a Complaint.   The Court granted the Motion but cautioned that no further extensions would be granted "absent exigent circumstances."

As noted above, on April 21, 2015, the Court entered an order of discharge. The Notice of Electronic Filing accompanying the entry of the discharge order on the docket reflects that it was sent electronically to counsel to the Debtors and counsel to Mr. Siegal at 2:14 pm on that day.   Three days later the Court discharged the Chapter 7 trustee and closed the case.

Despite the lack of activity on the docket during early April of 2015, Mr. Siegal and the Debtor were negotiating a Settlement Agreement and General Release (the "Settlement Agreement") at that time.   The Settlement Agreement identified the parties as the Debtor, Martin A. Siegal, individually, and Marty's Realty Trust.   In addition, the Settlement Agreement identified another party, namely, Siegal & Sons Investments, LTD, a Massachusetts corporation.   The Settlement Agreement purported to resolve extensive litigation involving Martin Siegal and his son.   It provided in pertinent part the following:

A. Lewis agrees that the Debt to the Creditors in the sum of $630,699.95

("2012 Judgment") is non-dischargeable.[3]

B. The parties hereto agree to jointly file a <u>Motion to Compromise Controversy or Motion to Approve Settlement Agreement</u> (the "2015 Settlement Agreement") or a similar filing in the Bankruptcy Proceeding seeking the Court's approval of the terms of this agreement.

C. The Creditors, on their own behalves [sic] and on behalf of their successors, heirs and assigns, hereby agree to undertake no collection actions or other adverse actions against Lewis with respect to collection on the Debt unless Lewis shall have accumulated net worth of not less than $5,000,000 [sic].

D. It shall be a breach of the 2015 Settlement Agreement for Lewis to fail to report the accumulation of a net worth of more than $5,000,000 to the Creditors.

E. This Agreement is subject to approval by the United States Bankruptcy Court.

At the conclusion of the Agreement in capital letters the following statement appears: "WE HAVE EACH READ THE FOREGOING AND SIGN OUR NAMES BELOW, INTENDING TO BE LEGALLY BOUND THEREBY. NOW WITNESS OUR HANDS AND SEALS." The Debtor, Lewis D. Siegal, executed the Settlement Agreement on April 17, 2015, the last date through which Martin Siegal, individually, had secured a legally binding extension of time to file a complaint under 11 U.S.C. §§ 523, 727. Martin Siegal executed the Settlement Agreement on April 21, 2015, the date the discharge order entered, on his own behalf, as trustee of Marty's Realty Trust, and in his capacity as officer and agent of Siegal & Sons Investments, LTD. Both signatures were notarized by notaries with Massachusetts' commissions.

---

[3] At the hearing on June 3, 2015 and in the Debtors' Opposition, counsel to the Debtors represented that this figure was a scrivener's error and the correct amount is $420,669.65.

The submissions of counsel to the parties in the form of attorneys' affidavits from counsel establish that on April 17, 2015 Debtors' counsel advised Mr. Siegal's counsel that the Debtor had executed the Settlement Agreement and that she would be forwarding the executed Settlement Agreement to Mr. Siegal's counsel.  Mr. Siegal's counsel, in response to an email advising him that the executed document was being forwarded to him, responded:  " . . . In reliance on that statement, we shall not file the petition today." Debtors' counsel then sent the following email:  "Attached please find the executed agreement which has been <u>forwarded in escrow pending receipt of your client's signature</u> and in reliance upon communications set forth below . . . ." (emphasis in original).

There is no evidence in the record as to time of day on April 21, 2015 when Mr. Siegal executed the Settlement Agreement.

## III. POSITIONS OF THE PARTIES

### A. <u>The Movant</u>

Mr. Siegal argued that the motion to reopen and to vacate the Debtor's discharge should be granted because:

> (1) the parties stipulated and agreed that they would petition the Court to approve the 2015 Settlement Agreement; (2) the granting of this motion will effectuate the joint interests of the parties, and will give effect to the 2015 Settlement Agreement; and (3) no parties will be prejudiced by the allowance of this motion.

At the hearing on June 3, 2015, counsel to Mr. Siegal, was unsure whether the Settlement Agreement constituted a reaffirmation agreement, although he insisted that a motion for additional time to file a complaint was not filed because the Debtor signed the Settlement

Agreement on April 17, 2015 and he contemplated the filing of a joint motion to approve

the Settlement Agreement.  He viewed the signature of his client as "just merely a matter

of . . . mechanics."  He added that a timely complaint was unnecessary because he had the

agreement of Lewis D. Siegal to affirm the debt.  He also contended that "[t]his is total

fraud in procuring discharge."  He concluded:

> I was defrauded. Martin was defrauded. I mean, this is fundamental fairness.
> I have his signature here on this agreement. That is fraud. I was absolutely,
> I was absolutely defrauded with no doubt, whatsoever. The fraud in the
> procurement of a discharge, this is fraud in procurement of the discharge.
>
> ***
>
> The fraud was that he signed it, thereby stating to me and Martin that he was
> going to abide by the terms and then put up substantial roadblocks in not
> working with us to effectuate the terms of it, which was to join the petition
> to the Court.

B. The Debtor

The Debtor argued that Mr. Siegal did not sign the Agreement until after the

deadline had expired, that he did not seek either to extend the deadline for objecting to the

discharge of the debt or to file a motion to approve the Settlement Agreement prior to the

entry of the discharge and the case closing, adding that a motion to enlarge the time to file

a reaffirmation agreement as required by Fed. R. Bankr. P. 4004 was not filed either.  The

Debtor further argued that there is no basis within the provisions of Fed. R. Bankr. P. 5010

and 11 U.S.C. § 350 to reopen the Debtors' case or to file a complaint to vacate the

discharge.  The Debtor, however, admitted:

In 2015, Lewis Siegal agreed he would pay the legal fees, but only in the

6

event that he accumulates a net worth of "more than $5,000,000.00". *The 2015 agreement was structured with the expectation that . . . the repayment obligation would not impose an undue hardship and as such, could satisfy the reaffirmation provisions of 11 U.S.C. § 524.*

(emphasis supplied).

The Debtor contended that Mr. Siegal cannot establish the elements for revocation of the discharge under 11 U.S.C. § 727(d), namely that "(1) the debtor obtained the discharge through fraud; (2) the creditor possessed no knowledge of the debtor's fraud prior to the granting of the discharge; and (3) the fraud, if known, would have resulted in denial of discharge under § 727(a)." *See* Yules v. Gillis (In re Gillis), 403 B.R. 137, 144 (B.A.P. 1st Cir. 2009).

Citing, *inter alia,* In re Clark, 401 B.R. 75 (Bankr. D. Conn. 2009), the Debtor also argued that "[t]reating the 2015 Settlement Agreement as a compromise which was in effect a reaffirmation agreement was desired so as to avoid the necessity of filing an adversary proceeding." The Debtor added, however, that "the Settlement Agreement was required be made *and* the Motion to approve filed prior to the entry of the discharge order and where it was not, the court's jurisdiction to [approve] reaffirmation of the obligation through the 2015 Settlement Agreement is expired." (emphasis in original).

## IV. DISCUSSION

### A. Issues

Mr. Siegal seeks to reopen the Debtors' bankruptcy case to vacate the discharge of the obligation set forth in the Settlement Agreement. The facts of the case raise two

potential avenues for relief. The first is straightforward. If the Debtor procured the discharge by fraud, the Court has the discretion to reopen the case to permit Mr. Siegal to file an adversary proceeding under 11 U.S.C. § 727(d). The second alternative would permit Mr. Siegal to establish, and this Court to find, that the Settlement Agreement was executed prior to the entry of the discharge, a circumstance that could warrant a finding that the Settlement Agreement is an enforceable reaffirmation agreement.

B. <u>Standard for Reopening</u>

Section 350(b) of the Code provides that a bankruptcy case may be reopened "to administer assets, to accord relief to the debtor, *or for other cause.*" 11 U.S.C. § 350(b) (emphasis supplied). *See also* Fed. R. Bankr. P. 5010. The Bankruptcy Code does not define "cause," <u>In re Clark</u>, No. 8-10-73746, 2010 WL 5348721, at *2 (Bankr. E.D.N.Y. Dec. 21, 2010) (citing <u>In re Cruz</u>, 254 B.R. 801, 804 (Bankr. S.D.N.Y. 2000)). The decision to reopen a case is within the court's discretion. <u>Id.</u> (citing <u>Cruz</u>, 254 B.R. at 804, and <u>In re Chalasani</u>, 92 F.3d 1300, 1307 (2d Cir.1996)). "The reopening of a case is discretionary, and the court should take into account equitable considerations." <u>In re Weber</u>, 283 B.R. 630, 635 (Bankr. D., Mass. 2002). *See also* <u>Ludvigsen v. Osborne (In re Ludvigsen)</u>, No. 14-039, 2015 WL 3733193, at *4 (B.A.P. 1st Cir. Jan. 16, 2015). The party moving to reopen the case bears the burden of proof. <u>In re Suber</u>, No. 06–20369, 2007 WL 2325229, at *1 (Bankr. D. N.J. Aug.13, 2007).

A case should not be reopened if the ultimate relief the movant seeks is inappropriate, and courts have held that the filing of an unenforceable reaffirmation

agreement does not constitute "cause" to reopen a case. *See, e.g.*, In re Suber, 2007 WL

2325229 at *1; In re Lee, 356 B.R. 177, 180 (Bankr. N.D. W.Va. 2006) (citing In re Pettet, 271

B.R. 855 (Bankr. S.D. Ind. 2002)); In re Rigal, 254 B.R. 145 (Bankr. S.D. Tex. 2000); In re

Brinkman, 123 B.R. 611 (Bankr. N.D. Ind. 1991).  The United States Bankruptcy Appellate

Panel for the First Circuit has recognized the following:

> "[T]he reopening of a case is a ministerial act which allows the file to be
> retrieved so the court can receive a new request for relief; the reopening, by
> itself, has no independent legal significance and determines nothing with
> respect to the merits of the relief to be requested." In re Andersen, 2011
> Bankr. LEXIS 317, at *14 (citations omitted). "[A]lthough the required
> reopening of a closed bankruptcy case serves no substantive purpose, by
> refusing to reopen a case, a court may effectively decline consideration of a
> proffered claim by way of its discretionary refusal to revisit a case's
> substantive issues." Leach v. Buckingham (In re Leach), 194 B.R. 812, 815
> (E.D. Mich. 1996). Thus, a bankruptcy court considering a motion to reopen
> should consider whether the moving party would be entitled to pursue the
> cause of action for which it seeks the reopening. If the movant cannot prevail
> on the merits of the action to be pursued as a matter of law, reopening the
> case would serve no purpose and the motion to reopen should be denied. *See*
> In re Gagne, No. 02–10966, 2010 Bankr.LEXIS 4706, at *2 (Bankr. D. Me. Dec.
> 16, 2010) (citing In re Hunter, 283 B.R. 353, 356 (Bankr. M.D. Fla. 2002)); In re
> Weber, 283 B.R. 630, 633 (Bankr. D. Mass. 2002) ("Although sequential logic
> would suggest that the Court first determine whether to reopen the case,
> there is no reason to reopen the case" if the movant cannot prevail on the
> cause of action to be pursued).

In re Ludvigsen, 2015 WL 3733193, at *4 (footnote omitted).

For the reasons set forth below, the Court shall allow the motion to reopen.

Although the Court concludes that Mr. Siegal cannot establish the elements required to file

a complaint to vacate Lewis D. Siegal's discharge under 11 U.S.C. § 727(d), the Court

determines that Mr. Siegal may be able to establish an enforceable reaffirmation agreement.

9

Accordingly, the Court shall enter an order reopening the Debtor's case.


C. Revocation of the Discharge

"Discharge revocation is an extraordinary remedy, which 'should be construed liberally in favor of the debtor and strictly against those objecting to discharge.'" The Cadle Co. v. Andersen (In re Andersen), 476 B.R. 668, 672 (B.A.P. 2012)(quoting Yules v. Gillis (In re Gillis), 403 B.R. 137, 144 (B.A.P. 1st Cir. 2009)). The party seeking revocation bears the burden of proving each of these elements by a preponderance of the evidence. In re Gillis, 403 B.R. at 144 (citing Grogan v. Garner, 498 U.S. 279 , 289 (1991)). In addition to the elements that must be proven, which the Debtor set forth in its Opposition, the plaintiff must also show that "the debtor obtained a discharge by committing 'actual fraud' or 'fraud in fact,' such as the intentional failure to schedule an asset of the estate." Id. at 144-45 (citing 6 Collier on Bankruptcy ¶ 727.15[2] (15th ed. rev.2000)).

Mr. Siegal failed to argue, let alone proffer facts, that would support the conclusion that the Debtor obtained his discharge by fraud. The Debtor executed the Settlement Agreement on April 17, 2015. The failure of Mr. Siegal to immediately execute the Settlement Agreement and file it with the Court together with a motion for its approval, or to obtain a further extension of time to file a complaint under 11 U.S.C. §§ 523, 727, cannot be attributed to fraud on the Debtor's part. Rather, counsel to Mr. Siegal relied on the Debtor's signature on the Settlement Agreement in failing to promptly obtain his client's signature or to file a motion for a further extension of time to file a complaint. In

other words, it appears that counsel to Mr. Siegal believed that his client's signature was

sufficient for the Settlement Agreement to be enforceable, even if the motion to approve

it was filed after the entry of the discharge.  Accordingly, no meritorious grounds exist to

reopen the Debtors' Chapter 7 case for the purpose of filing a complaint under § 727(d).

D. Enforceable Reaffirmation Agreements

Section 524(c) provides in pertinent part the following:

(c) An agreement between a holder of a claim and the debtor, the
consideration for which, in whole or in part, is based on a debt that is
dischargeable in a case under this title is enforceable only to any extent
enforceable under applicable nonbankruptcy law, whether or not discharge
of such debt is waived, only if--

(1) such agreement was made before the granting of the
discharge under section 727, 1141, 1228, or 1328 of this title;

(2) the debtor received the disclosures described in subsection
(k) at or before the time at which the debtor signed the
agreement;[4]

(3) such agreement has been filed with the court and, if
applicable, accompanied by a declaration or an affidavit of the
attorney that represented the debtor during the course of
negotiating an agreement under this subsection, which states
that–

(A) such agreement represents a fully informed
and voluntary agreement by the debtor;

---

[4] Where 1) the Debtor argued that the Settlement Agreement was structured with
the expectation that the repayment obligation would not impose an undue hardship
and the provisions of § 524 could be satisfied; 2) no payment obligations were
contemplated by the parties, unless the Debtor's net worth exceeded $5 million; and 3)
the debt was not a consumer debt secured by any collateral, the Court concludes that
the requirements of subsection § 524(k) are not implicated and were waived by the
Debtor.

(B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

(C) the attorney fully advised the debtor of the legal effect and consequences of--

(i) an agreement of the kind specified in this subsection; and

(ii) any default under such an agreement;

(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;

(5) the provisions of subsection (d) of this section have been complied with; . . . .

11 U.S.C. § 524(c).  The sole issue in this case is whether the Settlement Agreement was executed by Mr. Siegal prior to the entry of the discharge.  Because the Debtor admitted that the Settlement Agreement was "structured with the expectation that the repayment obligation would not impose an undue hardship and as such, could satisfy the reaffirmation provisions of 11 U.S.C. § 524," the Court finds that the Debtor waived compliance with 11 U.S.C. § 524(c)(2)-(5).

The court In re Salas, 431 B.R. 394 (Bankr. W.D. Tex. 2010), set forth the law applicable to reaffirmation agreements.  It stated:

If the reaffirmation agreement was not made prior to the date of the debtor's discharge, then it is too late to file the reaffirmation agreement. This is so because, under section 524(c)(1), such an agreement must be made prior to the entry of a debtor's discharge in order to be effective. "Made" means signed by the parties to the agreement. See In re Herrera, 380 B.R. 446, 450–51

(Bankr. W.D. Tex. 2007); *see also* <u>Whitehouse v. LaRoche</u>, 277 F.3d 568, 574 (1st Cir. 2002); <u>Lichtenstein v.Barbanel</u>, 161 Fed.Appx. 461 (6th Cir.2005); <u>In re Turner</u>, 156 F.3d 713, 718 (7th Cir. 1998); <u>Lee v. Yeutter</u>, 917 F.2d 1104, 1106 n. 3 (8th Cir. 1990); <u>Republic Bank of Ca. v. Getzoff (In re Getzoff)</u>, 180 B.R. 572, 574–75 (9th Cir. BAP 1995); <u>Schott v. WyHy Fed. Credit Union (In re Schott)</u>, 282 B.R. 1, 7 (10th Cir. BAP 2002). As this court observed in <u>Herrera</u>,

> Because reaffirmation agreements are effectively waivers of discharge with respect to a particular creditor, they are exceptions to the "fresh start" policy of the bankruptcy process. As such, the reaffirmation exception is strictly construed, and the requirements imposed for their enforceability are themselves enforced rigidly. *See* <u>Matter of Duke</u>, 79 F.3d at 44; <u>In re Jamo</u>, 283 F.3d 392, 398 (1st Cir.2002) (citations omitted); *see also* <u>In re Bennett</u>, 298 F.3d 1059, 1067 (9th Cir.2002) (citing <u>Republic Bank of Cal. v. Getzoff (In re Getzoff)</u>, 180 B.R. 572, 574 (9th Cir. BAP 1995)).

<u>Herrera</u>, at 450–51.

<u>In re Salas</u>, 431 B.R. at 396. The court in <u>Salas</u> further observed:

> If the agreement was executed prior to [the entry of discharge], however, then it will be possible for the debtor to file the reaffirmation agreement at this late date, provided the court grants relief under Rule 4008(a). That rule states that "the court may, at any time and in its discretion, enlarge the time to file a reaffirmation agreement." Fed. R. Bankr. P. 4008(a). It is a prerequisite for its enforceability that a reaffirmation agreement be filed with the clerk of court. *See* 11 U.S.C. § 524(c)(3); *see also* <u>In re Mausolf</u>, 403 B.R. 761, 765–66 (Bankr. S.D. Fla. 2009). Whether the court should grant the relief requested turns of course on whether granting the relief would be futile ( i.e., was the agreement made before or after the entry of discharge). It also turns, however, on whether the reaffirmation agreement would be an undue hardship on the debtor. This is so because, as a result of the discharge having already been entered, the court can no longer conduct a review of the agreement or have a hearing to determine undue hardship. The statute requires that any such hearing be conducted prior to the entry of the debtor's discharge. *See* 11 U.S.C. § 524(m); *see also* <u>In re Schmidt</u>, 2009 WL 1587690 (Bankr. W.D. Ohio April 16, 2009). The court cannot conduct the section 524(m) hearing now. It is too late. By the same token however, the court should not permit the late filing of the reaffirmation agreement if it appears

that the agreement would in fact impose just such a hardship.

In re Salas, 431 B.R. at 396-97. *See also* Pickerel v. Household Realty Corp. (In re Pickerel), 433 B.R. 679, 686 (Bankr. N.D. Ohio 2010) ("nothing in § 524(c) requires that a reaffirmation agreement be filed with the Court prior to the entry of an order of discharge. Rather, § 524(c)(3) set forth that, as a prerequisite to the enforceability of a reaffirmation agreement, it need only be established that 'such agreement has been *filed* with the court . . . .'" (emphasis added)). In other words, so long as a reaffirmation agreement is made *prior to* the entry of discharge, it can be filed with the court after entry of the discharge and be enforceable.

In applying § 524(c)(1), the court in In re LeBeau, 247 B.R. 537 (Bankr. M.D. Fla. 2000), found that a reaffirmation agreement had been "made," despite the failure of a debtor to formally execute the agreement until after the discharge is entered. In that case, the court, in interpreting § 524(c)(1), concluded that a reaffirmation agreement, even though not signed by the debtors until after the entry of their discharge, was "made" prior to the discharge because the debtors had commenced performance under the agreement prior to discharge and, in their statement of intention, declared their intention to reaffirm the debt. Id. at 540–41. The court stated:

> Under fundamental and basic contract principles, "[i]n order to form a binding contract, there must be a *meeting of the minds* 'by acceptance and performance within the terms of the offer.'" Otworth v. Florida Bar, 71 F.Supp.2d 1209, 1215 (M.D. Fla. 1999) (emphasis added). *See also* 11 Fla.Jur.2d Contracts § 21 (1997) ("Without a meeting of the minds of the parties on an essential element, there can be no enforceable contract"). And to determine when this "meeting of minds" and "performance" actually

occurred, a court may consider extrinsic evidence. Other courts have also been receptive of evidence outside of the actual affirmation agreement itself. *Cf*. In re Coots, 4 B.R. 281, 283 ("In the case at bar, the creditor has not offered any evidence indicating the subject agreement was entered into prior to ... the date of discharge.").

In re LeBeau, 247 B.R. at 540. Thus, a court can look to extrinsic evidence to determine when the meeting of the minds to form a binding contract happened. Id.

In In re Giglio, 428 B.R. 397 (Bankr. N. D. Ohio 2009), the court recognized that "the earliest date that a reaffirmation agreement may be considered to be made is the date it is signed by a debtor" but that neither case law nor § 524 provides that a reaffirmation agreement can be made by the debtor's signature alone. Id. at 401. The court, however, discussed the holding in LeBeau that when both the debtor and creditor manifest a meeting of the minds prior to discharge a debt can be reaffirmed. Nevertheless, the court held:

> "Thus, it is not the filing of the agreement prior to the discharge date which is a necessary prerequisite for its validity; rather, it is the entering into the agreement, i.e. the full and complete execution of an agreement which satisfies the terms of the Bankruptcy Code and, particularly § 524(c), by all parties thereto which controls."

In re Giglio, 428 B.R. at 402 (citing In re Golladay, 391 B.R. 417, 422 (Bankr. C.D. Ill. 2008)).

*See also* In re Picciano, 2008 Bankr.LEXIS 1440 at *2 (Bankr. E.D. Va. 2008) ("Without the signature of both parties, no contract exists, and, therefore, no agreement was made before the debtor's discharge as required by § 524(c)(1).").

E. Analysis

Upon consideration of the affidavits, the arguments of the parties, and the law applicable to reopening cases and the enforceablity of reaffirmation agreements, the Court

finds that Mr. Siegal has sustained his burden of establishing cause for reopening the Debtors' bankruptcy case, *see* In re Ludvigsen, 2015 WL 3733193, at *4, for attempting to establish through the submission of competent evidence that the Settlement Agreement is an enforceable reaffirmation agreement. *See* In re Pickerel, 433 B.R. at 686; In re Salas, 431 B.R. at 396-97.

The Settlement Agreement between Mr. Siegal and the Debtor must be construed as a reaffirmation agreement. Lewis D. Siegal stated that the Settlement Agreement was structured as a reaffirmation agreement. In exchange for Mr. Siegal's promise to refrain from attempting to collect the debt unless the Debtor's net worth was "more than $5,000,000," the Debtor agreed the debt would be nondischargeable. The mutual promises contained in the Settlement Agreement were part of a larger goal to heal a family rift. Mr. Siegal never articulated in any pleadings the basis for the conclusion that the Debtor's obligation for legal fees was potentially nondischargeable by referencing a particular subsection of 11 U.S.C. § 523(a), and Debtors' counsel intimated in open court that the Lewis D. Siegal was unlikely to amass a net worth of more than $5 million, a conclusion buttressed by the Trustee of a Report of No Distribution. Because the Settlement Agreement required undertakings by both Mr. Siegal and the Debtor, the Court concludes that both their signatures were required, a circumstance the parties both recognized. *See* In re Giglio, 428 B.R. at 401.

If Mr. Siegal executed the Settlement Agreement prior to the entry of the discharge on April 21, 2015, i.e, before the entry of the discharge on the Court's docket, then "such

16

agreement was made before the granting of the discharge." This Court concludes that under that limited circumstance, the Debtor's reaffirmation of the debt owed to Mr. Siegal would be enforceable, contingent upon compliance with Fed. R. Bankr. P. 4008(a). Accordingly, the Court shall afford Mr. Siegal an opportunity to submit further evidence as to the time of day he executed the Settlement Agreement on behalf of himself, Marty's Realty Trust and Siegal & Sons Investments, LTD.

## V. CONCLUSION

Upon consideration of the foregoing, the Court shall enter an order reopening the Debtor's Chapter 7 case "for cause." The Court shall enter an order requiring Mr. Siegal to submit competent evidence as to the time the Settlement Agreement was executed on April 21, 2015 and affording the Debtor an opportunity to rebut that evidence. The Court shall schedule an evidentiary hearing, if necessary, for the limited purpose of affording Mr. Siegal an opportunity to submit evidence as to precisely when the Settlement Agreement was executed.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Court

Dated: July 29, 2015

17